IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

DARRIAN DEANS,

        Plaintiff

    vs.

AUGUSTUS FLOYD, CORRECTIONS
LIEUTENANT; LT. STAFFORD, LT.
JOHNSON, LT. HELIKER, and LT.
WAIDE,

        Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)

1:21-CV-00362-RAL

RICHARD A. LANZILLO
Chief United States Magistrate Judge

MEMORANDUM OPINION ON
DEFENDANTS' MOTION TO DISMISS

ECF NO. 34

I.     Introduction

Plaintiff Darrian Deans, a prisoner in the custody of the Pennsylvania Department of

Corrections ("DOC"), brings this *pro* se civil rights action pursuant to 42 U.S.C. § 1983 against

five corrections officers at the State Correctional Institution at Albion ("SCI-Albion"), Lt.

Augustus Floyd, Lt. Stafford, Lt. Johnson, Lt. Heliker, and Lt. Waide. ECF No. 30. The

operative pleading before the Court is Deans' Amended Complaint. *Id.* Therein, Deans asserts

three counts against all Defendants: a violation of "the First and Fourteenth Amendment right to

be free of punishment and retaliation for protected activities" (Count I); a violation of the

Fourteenth Amendment's equal protection clause (Count II); and a violation of the "First

Amendment right to association and intimate familial relations and communications" (Count

III). ECF No. 30, ¶¶ 57, 63. The Amended Complaint also asserts a claim for violation of a

Pennsylvania state regulation, 37 Pa. Code § 93.10, solely against Floyd (Count IV). The

Amended Complaint seeks compensatory and punitive damages as well as unspecified

declaratory and injunctive relief. ECF No. 30, p. 16.

Defendants have moved to dismiss Counts II and IV and certain claims brought under Counts I and III pursuant to Fed. R. Civ. P. 12(b)(6). ECF No. 34. Deans has filed a brief in opposition to the motion. ECF No. 38. The matter is ripe for disposition.[1]

II.    Factual Background

For purposes of the pending motion, the factual allegations of Deans' Amended Complaint are accepted as true. Deans was transferred from the State Correctional Institution at Fayette to SCI-Albion on June 11, 2019. Upon arrival at SCI-Albion, "a facility property officer checked, searched and cleared every item of [Deans'] personal property, including electronics items," and inventoried them. ECF No. 30, ¶ 8. About a week later, Floyd "interviewed [Deans], and questioned him about previous misconducts, associations and relations with staff." *Id.*, ¶ 9. Floyd informed Deans that the DOC Bureau of Investigations and Intelligence (BII) was investigating certain prisoners incarcerated at SCI-Fayette who were believed to be involved with drug operations in the prison. Floyd then proceeded to question Deans, but he declined to answer. Floyd then told him that he suspected Deans was involved with the rumored illicit activities, but that SCI-Albion offered Deans a "fresh start." *Id.*, ¶ 10. Floyd urged Deans to cooperate in the investigation and warned him "that refusing to cooperate would have negative consequences." *Id.*

About two months later, Floyd advised Deans that he was considering separating him and his brother, who was also housed at SCI-Albion. Floyd then asked him to "reconsider[] his refusal to provide information about illicit activity by SCI-Fayette prisoners." *Id.*, ¶ 12. Deans again declined. He also advised Floyd that because he had no legitimate basis for separating

---

[1] This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and it can exercise supplemental jurisdiction over the state law claims under 28 U.S.C. § 1337. The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, as authorized by 28 U.S.C. § 636. *See* ECF Nos. 2, 23, 41.

him and his brother, Deans could grieve the separation order.  In a "loud, hostile manner,"
Floyd responded by "promis[ing] [Deans] that his life at SCI-Albion would get hard, really fast,
if he grieved it." *Id.*  Thereafter, "Defendants Floyd, Stafford and/or Johnson ordered a facility
separation between [Deans] and his brother," which prohibited them from "being housed on the
same side of the facility," "sharing activities" and directly communicating. *Id.*, ¶ 13.

On or around August 20, 2019, Floyd and a BII investigator brought Deans to an
interview room.  After Floyd exited the room, the BII investigator proceeded to again question
Deans "about illicit drug activity at SCI-Fayette and his (plaintiff's) connection with those
activities." *Id.*, ¶ 15.  After the interview ended and they had existed the interview room, Floyd
pulled Deans aside and after assuring him "that DOC did not want to prosecute him, but rather,
BII just wanted information about SCI-Fayette and drug activity there," he "again urged [him]
to cooperate, and explained that should [Deans] persist in his refusal to answer questions, he
(Floyd) would make sure his life at SCI-Albion would become truly miserable." *Id.*, ¶ 16.
Deans again declined to participate and then headed back to his housing unit.

Two months later, Floyd brought Deans into a private room to be interviewed by the BII
investigator again.  Before entering the interview room, he reiterated to Deans "that he would
suffer serious or negative consequences if he refused to cooperate, but then he also promised to
reward him if he provided useful information." *Id.*, ¶ 18.  After listening to the BII
Investigators' questions, Deans "again asserted his right to remain silent." *Id.*

On December 6, 2019, "Floyd informed [Deans] that an informant provided information
about a plan to bring illicit drugs into the facility" and that Deans would be moved to the
Restricted Housing Unit ("RHU") pending an investigation into these claims. *Id.*, ¶ 19.  A week
later, Floyd issued Deans Misconduct 0432747 charging him with "criminal conspiracy,

attempted possession of controlled substances and unauthorized use of the telephone." *Id.*, ¶ 20.
The misconduct hearing was initially scheduled for the next day, December 14, but was
postponed to an unspecified date. *Id.*, ¶ 21.

On December 17, Floyd again brought Deans to an interview room to be question by the
BII investigator. "Floyd indicated that [Deans'] changed circumstances prompted them to again
ask for his cooperation" in the drug investigation. *Id.*, ¶ 23. The BII investigator once more
questioned Deans about illicit drug operations at SCI-Fayette; neither the investigator nor Floyd
discussed the pending misconduct. Again, Deans "declined to answer questions and asserted
his right to remain silent." *Id.*, ¶ 22. Floyd then "indicated that misconduct charges (like those
at no. 0432474[2]) could be expected if [Deans] persisted in refusing to cooperate," and he
"promised that he would make it his 'mission' in life to 'get' [Deans], to keep him locked up, to
make his life miserable, and to see him criminally prosecuted." *Id.*, ¶ 24. Floyd also told Deans
that, in exchange for his cooperation with the BII's investigation into SCI-Fayette, he could
"drop the misconduct charges," "release [Deans] from the RHU," "reinstate [Deans'] contact
visiting privileges," and "get [Deans] transferred to a DOC facility of his choice." *Id.* In
response, Deans "asserted his right to remain silent and asked for an attorney." *Id.* Floyd then
sent him back to his RHU cell. On January 10, 2020, the hearing examiner found Deans guilty
of misconduct 0432747, allegedly at Floyd's direction, and sentenced him to seventy-five days
in the RHU.

About a year later, "Floyd ordered [Deans] confined to the RHU, pending
investigation," as well as "the confiscation and seizure of [Deans'] personal property, including

---

[2] Deans likely meant "no. 0432747," the misconduct Floyd issued that resulted in his RHU placement and that
forms the basis of many of Deans' legal claims, and not misconduct "no. 0432474," a misconduct number repeated
nowhere else in the pleadings or the exhibits appended to Deans' original Complaint. *See* ECF Nos. 14 – 14-7, 30,
38.

electronics items." *Id.*, ¶ 27.  Deans consequently spent two weeks in the RHU, during which

time he was prohibited from obtaining "shower shoes, personal hygiene items, a change of

underclothes and Koran [sic] or other religious materials." *Id.*, ¶ 28.  Deans repeatedly asked

Defendants Heliker and Waide for access to "basic issue and clothing items, and permitted

property items," but they told him that he was not permitted these items "per 'security' and that

approval from Lt. Floyd was required before he would receive anything." *Id.*, ¶ 29.

Meanwhile, "every other RHU prisoner was provided with RHU basic issue [sic] and permitted

personal property items." *Id.*  Deans grieved the denial of these items in Grievance 912561, and

the facility manager "partly confirmed" his claim. *Id.*, ¶ 29.

　　While still in the RHU, Floyd directed a security officer to issue Deans misconduct

0207685 charging him with possession of contraband.  "Although most of the confiscated items

were [Deans'] lawful property (as confirmed during the transfer intake process), the charges as

to all items were sustained" at the January 30, 2021 misconduct hearing. *Id.*, ¶ 30.  Deans

consequently had to surrender the property at issue.  The next day, Floyd directed Defendant

Stafford to order Deans' confinement in the RHU.  He remained there until February 18, 2021.

"No disciplinary or misconduct rationale" ever "justif[ied] this period of RHU confinement."

*Id.*, ¶ 34.

　　"Sometime between January 14, 2021 and February 18, 2021," Floyd blocked Deans

from dialing and receiving calls from certain telephone numbers that had been approved before

Deans went to the RHU, including his first cousin's number. *Id.*, ¶ 35.  On about February 16,

2021, Floyd told Security to monitor Deans' phone calls to try and catch Deans dialing the

phone numbers that Floyd had blocked. *Id.*, ¶ 36.  Thereafter, "Floyd directed or authorized

preparation of misconduct reports (nos. 0610662 and 610684) charging [Deans] with

unauthorized use of a telephone," and ordered further blocks on formerly approved telephone numbers. *Id.*, ¶ 37.

On April 11, 2021, Deans received misconduct 0640305 "charging [Deans] with assault and other violations." *Id.*, ¶ 38. At his misconduct hearing three days later, the hearing examiner found him guilty of one of the charges and sentenced him to another 60 days in the RHU. The next day, "officers escorted [Deans] to the RHU property area for routine search and inventory of his personal property items." *Id.*, ¶ 40. Defendant Waide then appeared and "ordered officers to confiscate and seize all of [Deans'] property, including property items approved for retention during RHU confinement," again, allegedly, per Floyd's instruction. *Id.* Thereafter, Floyd "required [Deans] to be confined in a RHU cell with no shower shoes, personal hygiene items" or "change of underclothes," while "every other RHU prisoner was provided with RHU basic issue and permitted personal property items." *Id.*, ¶ 41. Additionally, "Floyd and/or Waide refused to provide [Deans] with either his personal Koran and Islamic texts (or another copy of same)" for twenty-six days "during the annual Ramadan month (from April 12, 2021 to May 11, 2021) with full knowledge and understanding of a Muslim's need for said texts during that period." *Id.*, ¶ 43. On May 7, 2021, four days before Ramadan ended, Floyd permitted Deans to have access to his "personal property items, including his Koran and Islamic texts." *Id.*

Deans returned to general population on May 25, 2021, at which point, Floyd ordered the "close[] monitoring and censoring of [Deans'] emails . . . for about two to three months." As a result, his emails were delayed for three to four weeks, and about twelve of his emails contained censored language. *Id.*, ¶ 44. Deans grieved the censoring of his email and the

enhanced monitoring in Grievances 930644 and 942120.  His "claims were partly confirmed by the facility manager." *Id.*, ¶ 46.

Floyd, Johnson, and Stafford ultimately initiated Deans' transfer out of SCI-Albion and into the DOC's Drug Elimination Management Operation ("DEMO"), which confines prisoners "in segregated housing, with limited privileges, for at least one year." *Id.*, ¶ 50.  Deans contends that his transfer was based on these Defendants' "analysis of [his] behavior, which entailed exaggerated conclusions indicating that he is a high-level participant in illicit drug trafficking activities," "their own unsupported speculations," and "[Deans'] refusal to 'cooperate' with investigators." *Id.*, ¶ 48.  The date of his transfer and length of time he is to remain in the DEMO program is not specified.

III.   Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a Rule 12(b)(6) motion to dismiss, the court must accept as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. *See U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002).  The "court[] generally consider[s] only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim" when considering the motion to dismiss. *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997)).

In making its determination under Rule 12(b)(6), the court is not opining on whether the plaintiff is likely to prevail on the merits; rather, the plaintiff must only present factual allegations sufficient "to raise a right to relief above the speculative level." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 556 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004)). *See also Iqbal*, 556 U.S. 662. Furthermore, a complaint should only be dismissed pursuant to Rule 12(b)(6) if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 (rejecting the traditional Rule 12(b)(6) standard established in *Conley v. Gibson*, 355 U.S. 41, 78 (1957)).

While a complaint does not need detailed factual allegations to survive a motion to dismiss, a complaint must provide more than labels and conclusions. *See Twombly*, 550 U.S. at 555. A "formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Moreover, a court need not accept inferences drawn by a plaintiff if they are unsupported by the facts as explained in the complaint. *See California Pub. Emp. Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (citing *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). Nor must the court accept legal conclusions disguised as factual allegations. *See Twombly*, 550 U.S. at 555; *McTernan v. City of York, Pennsylvania*, 577 F.3d 521, 531 (3d Cir. 2009) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

Expounding on the *Twombly/Iqbal* line of cases, the Third Circuit has articulated the following three-step approach:

> First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' *Second*, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)).  This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Finally, because Plaintiff is proceeding *pro se*, the allegations in the complaint must be held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520-521 (1972).  If the court can reasonably read a *pro se* litigant's pleadings to state a valid claim upon which relief could be granted, it should do so despite the litigant's failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or unfamiliarity with pleading requirements. *See Boag v. MacDougall*, 454 U.S. 364 (1982); *United States ex rel. Montgomery v. Bierley*, 141 F.2d 552, 555 (3d Cir. 1969) (petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance").

IV.   Discussion

Defendants argue that Deans' claims based on his separation from his brother are barred by the applicable statute of limitations.  Additionally, they assert that the Amended Complaint fails to state viable Fourteenth Amendment equal protection and due process claims.[3]  Lastly, Defendants contend that no private cause of action exists under the state regulation codified at 37 Pa. Code § 93.10.  The Court will address each argument in turn.

---

[3] Defendants also argue that the Amended Complaint fails to state a Fourteenth Amendment claim based on the alleged destruction of his property.  In his opposition brief, Deans asserts that he "declines to oppose" this argument because "no such claim has been asserted."  ECF No. 38, p. 2; *see id.*, p. 5 n.3.  Deans' acknowledgement eliminates any need to assess whether the Amended Complaint states a Fourteenth Amendment destruction of property claim.

A. The present record docs not establish that the statute of limitations bars Deans' § 1983 claim based on his separation from his brother.

The expiration of the statute of limitations is an affirmative defense that the defendant must plead and prove. *See* Fed. R. Civ. P. 8(c)(1); *Bradford-White Corp. v. Ernst & Whinney*, 872 F.2d 1153, 1161 (3d Cir. 1989). Generally, "the Federal Rules of Civil Procedure require that affirmative defenses be pleaded in the answer." *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002). The Court of Appeals for the Third Circuit recognizes a exception, however, that allows "a limitations defense to be raised by a motion under Rule 12(b)(6), but only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" *Id.* (quoting *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975)) (footnote omitted). As such, "[i]f the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)." *Id.* (quoting *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978)). "'The face of the complaint' has, in turn, been interpreted to mean the allegations contained in the complaint, matters of public record, 'materials embraced by the complaint, and materials attached to the complaint.'" *Houser v. Feldman*, 600 F. Supp. 3d 550, 563 (E.D. Pa. 2022) (citing *Hoffman v. Nordic Naturals, Inc.*, 837 F.3d 272, 280 n.52 (3d Cir. 2016) (quoting *C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 764 (8th Cir. 2012))).

Claims pursuant to § 1983 are subject to the most analogous state statute of limitations, which, in Pennsylvania, is the two-year statute of limitations for personal injury actions. *See Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985); *Urrutia v. Harrisburg County Police Dept.*, 91 F.3d 451, 457 n.9 (3d Cir. 1996) (citing 42 Pa. C.S. § 5524). *See also Wallace v. Kato*, 549 U.S. 384 (2007) (for § 1983 claims, "the length of the statute of limitations ... is that which the State provides for personal-injury torts.") (citing *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)

(in each state, § 1983 claims are governed by the state's "general or residual statute for personal injury actions")). A cause of action accrues for statute of limitations purposes when the plaintiff knows or has reason to know of the injury that constitutes the basis of the cause of action. *Sameric Corp. of Delaware, Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998); *Nelson v. County of Allegheny*, 60 F.3d 1010 (3d Cir. 1995). "The determination of the time at which a claim accrues is an objective inquiry" concerned with "what a reasonable person should have known." *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009). Under the prison mailbox rule, the Court treats the filing of Deans' Complaint as September 28, 2021, the day he signed his complaint.[4] ECF No. 14, p. 11.

Defendants contend that Deans' § 1983 claim based on Floyd's order for "a facility separation between [Deans] and his brother" is untimely because the date of the separation is August 9, 2019—more than two years before Deans signed the Complaint. ECF No. 30, ¶ 13. *See* ECF No. 35, pp. 13-15. Defendants add that "it is apparent by the allegations in the Amended Complaint that [Deans] was aware of the separation when it happened." ECF No. 35, p. 15. Deans counters that "[w]hile the initial threat by Defendant Floyd did occur approximately one month beyond the limitations period, the actual violation did not occur until later --at least not until Floyd issued his separation order, and [Deans] was informed of that fact." ECF No. 38, p. 9. Deans further argues that "it is not at all clear (based on currently known facts) that Defendant Floyd's separation order did not occur within the two-year limitations period." *Id.*, p. 8. The Court agrees.[5]

---

[4] Pennsylvania applies the prison mailbox rule, which provides that the "date of delivery of [the pleading] by the [inmate] to the proper prison authority or to a prison mailbox is considered the date of filing of the [pleading]." *Galtoghab v. Doe*, 2016 WL 757739, at *3 (W.D. Pa. 2016) (quoting *Commonwealth v. Little*, 716 A.2d 1287 (Pa. Super. Ct. 1998)).

[5] The Court recognizes that Deans' argument is somewhat coy in that he does not state that the separation order occurred within two years of his filing of the Complaint, only that the face of the Complaint does not disclose its

The facts alleged in the Amended Complaint identify August 9, 2019 as the date that "Floyd approached [Deans] (near his housing unit entrance) to state that he (Floyd) was considering a separation between [Deans] and his brother." ECF No. 30, ¶ 12. However, the Amended Complaint does not identify this date or any other date as when Floyd ordered the separation, when Deans learned of the separation, or when the separation occurred. Based on the other allegations of the Amended Complaint, it seems likely that Deans learned of the separation order more than two years prior to his filing of the action. But the allegations do not conclusively establish this timing and, given the Court's standard of review on a motion to dismiss and Deans' pro se status, it cannot hold that Deans' claims based on the separation are barred as a matter of law. Instead, it is Defendants' burden to plead the statute of limitations as an affirmative defense in their Answer and then provide the Court with a record adequate to decide the issue. Defendants may reassert this defense in an early motion for partial summary judgment without prejudice to their right to file a more comprehensive motion for summary judgment prior to the deadline set by the Court. The face of the Amended Complaint, however, is insufficient to demonstrate that Deans' familial separation claims are barred by the two-year statute of limitations.

> B. The Amended Complaint fails to state a cause of action under the Fourteenth Amendment's Equal Protection Clause.

Deans avers that "Defendants' actions or inactions, resulting in [him] being treated in a discriminatory, disproportionate manner, violated rights" guaranteed by the Fourteenth Amendment's Equal Protection Clause. ECF No. 30, ¶ 60. The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the

---

date. Nevertheless, he is correct that the absence of this date from the current record precludes a finding that his claim is barred for purposes of a motion to dismiss under Rule 12(b)(6).

laws." U.S. Const. Amend. XIV, § 1. "This is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated alike.'" *Artway v. Attorney Gen. of State of N.J.*, 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). In his opposition brief, Deans clarifies that he is attempting to assert an Equal Protection violation under a "class of one" theory. ECF No. 38, p. 2. To state a plausible claim under this theory, "a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Phillips v. County of Allegheny*, 515 F.3d 224, 243 (3d Cir. 2008). Persons are "similarly situated" for equal protection purposes when they are alike "in all relevant aspects." *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)).

The Amended Complaint discusses two instances where Deans "was denied all basic issue items and permissible personal property items" while in the RHU. ECF No. 30, ¶28. Deans asserts that Defendants denied him these materials first for a two-week period beginning on January 14, 2021, when "Floyd ordered [Deans] confined in the RHU, pending investigation;" and second, after being sent to the RHU in relation to Misconduct 0640305, for a period of twenty-six days beginning on April 11, 2021. ECF No. 30, ¶ 27. On each occasion, Deans avers, "during that same period, every other RHU prisoner was provided with RHU basic issue and permitted personal property items." *Id.*, ¶ 28, 41. Defendants maintain that these allegations fail to establish the first prong of a class-of-one equal protection claim because he has not "identif[ied] other RHU prisoners who were also suspected of bringing drugs into the

institution and who were not subject to the same property restrictions while in the RHU." ECF No. 35, p. 5. The Court agrees.

Deans retorts that because DOC policy entitles all RHU prisoners "to basic issue items (and permitted personal property items)," and "[his] claim involves disparate treatment with respect to" these "items, [he] is similarly situated with all RHU prisoners in the relevant respects." ECF No. 38, p. 4. While "similarly situated does not mean identically situated," *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3rd Cir. 2020), courts in this Circuit have routinely held that all inmates in the RHU are not similarly situated for a class-of-one claim because they are placed in the RHU for a myriad of reasons. *See Jenkins v. Murray*, 352 Fed. Appx. 608, 610–11 (3d Cir. 2009) ("We agree with the District Court's conclusion that Jenkins fails to state a claim for an equal protection violation, as he fails to allege that the other inmates had been placed in the RHU for the same reasons or in the same form of custody."); *Jones v. Sposato*, 783 Fed. Appx. 214, 217 (3d Cir. 2019) (general allegations that plaintiff was treated "less favorably" are not sufficient); *Carson v. Mulvihill*, 488 Fed. Appx. 554, 563 (3d Cir. 2012) (rejecting equal protection claim when inmate did "not allege facts showing that he was similarly situated to the inmates who received wheelchair footrests, crutches and canes, or that there was no rational basis for his different treatment"); *Zuber v. Sorber*, 2023 WL 3077807, at *7 (E.D. Pa. Apr. 21, 2023) ("He alleges in conclusory fashion that the inmates housed on the L-C Unit prior to and after his assignment there were 'similarly situated' but he does not allege any facts describing why they were similarly situated and how they were treated differently"); *Maxwell v. Sober*, 2021 WL 4709706, at *6 (E.D. Pa. Oct. 8, 2021) ("Although he claims he was treated differently than other inmates charged with serious or violent misconducts, it is not clear from this vague allegation that these inmates were similarly situated or how they were treated more

14

favorably."); *McKeithan v. Kerestes*, 2014 WL 3734569, at *10 (M.D. Pa. July 28, 2014).

Accordingly, Deans has failed to state a class-of-one equal protection claim based on

Defendants' alleged refusal to allow him access to approved property items when he was in the

RHU for two weeks in January 2021 and twenty-six days several months later.

        C.  37 Pa. Code § 93.10 does not create a private or implied right of action for
           monetary relief.

      In Count IV of the Amended Complaint, Deans asserts a claim for monetary relief

against Floyd under 37 Pa. Code § 93.10—a state regulation "establish[ing] a baseline policy for

prisons to manage disciplinary infractions." *Burns v. PA Dep't of Corr.*, 642 F.3d 163, 168 (3d

Cir. 2011). This regulation requires prisons to adopt

> [p]rocedures which conform to established principles of law for
> inmate discipline including the following . . . (1) Written notice of
> charges. (2) Hearing before an impartial hearing examiner or an
> informal resolution process for charges specified by the
> Department in the Department of Corrections Inmate Handbook,
> or any Department document that is disseminated to inmates. The
> informal resolution process is described in DC-ADM 801—
> Inmate Discipline. The process gives inmates the option to meet
> with staff to resolve a misconduct rather than proceed with a
> hearing. (3) Opportunity for the inmate to tell his story and to
> present relevant evidence. (4) Assistance from an inmate or staff
> member at the hearing if the inmate is unable to collect and
> present evidence effectively. (5) Written statement of the
> decision and reasoning of the hearing body, based upon the
> preponderance of the evidence. (6) Opportunities to appeal the
> misconduct decision in accordance with procedures in the
> Department of Corrections Inmate Handbook.

37 Pa. Code § 93.10(b).

      In determining the viability of Deans' claim pursuant to § 93.10(b), the Court must first

ascertain its parameters. His claim is based on allegations that he did not receive a hearing on

Misconduct 0432747 before an impartial hearing examiner as required by prison policy because

Floyd "induced and directed a DOC hearing examiner to find [Deans] guilty, and impose a

sanction" of seventy-five days in the RHU. ECF No. 30, ¶ 66. Deans also alleges that his hearing was "based upon the unverified and uncorroborated account of an unknown (or non-existent) confidential informant," *id.*, in violation of the DC-ADM § 801's requirement that an in-camera hearing be conducted "[w]hen a misconduct charge is based upon information supplied by a confidential informant." Based on these allegations, Deans seeks compensatory and punitive damages against Floyd. He does not seek mandamus or similar relief to compel any DOC official to provide him with a new hearing or otherwise to comply with his understanding of the requirement of § 93.10 or DC-ADM 801.[6] *See* ECF No. 30, ¶¶ 65-68, pp. 15-16.

Defendants argue that "any failure by Corrections Defendant Floyd to adhere to these provisions does not provide a predicate for a cause of action under Pennsylvania law." ECF No. 38, p. 8. Defendants add that Deans' claim also fails because DOC regulations and policies do not create rights or constitutionally protected liberty or property interests triggering Deans' due process protections. Deans counters that prisoners "retain a state-law cause of action to remedy prison officials' failure to comply with § 93.10 and DC-ADM 801 procedures," and expressly disclaims any intention to assert his claim as a federal due process claim. ECF No. 38, pp. 6-7, 5 n.3.

The viability of Dean's state law claim depends initially on whether § 93.10's enabling statute creates a private cause of action for money damages or authorizes the DOC to adopt regulations that create a private cause of action. *See Est. of Witthoeft v. Kiskaddon*, 557 Pa.

---

[6] The introductory paragraph of Deans' Amended Complaint states that he seeks "declaratory, injunctive and compensatory relief for violation of his constitutional rights." ECF No. 30, p.1. However, the Amended Complaint does not request any injunctive relief or prospective declaratory relief in connection with his claim against Floyd in Count IV. *See id.*, ¶¶ 65-68, pp. 15-16. Specifically, the Amended Complaint does not request a new hearing on Misconduct 0432747 before a different hearing examiner.

340, 345 (1999); *Kalick v. Nw. Airlines Corp.*, 372 Fed. Appx. 317, 320 (3d Cir. 2010)

("Whether a regulation confers a private right of action depends on whether the enabling statute

creates a personal right or authorizes the regulating agency to do so.") (citations omitted). The

DOC's authority for issuing 37 Pa. Code § 93.10 is Section 506 of the Pennsylvania

Administrative Code of 1929, which empowers the "heads of all administrative departments"

and the independent and "departmental administrative boards and commissions" to "prescribe

rules and regulations, not inconsistent with law, *for the government of their respective*

*departments, boards, or commissions . . .*" 71 P.S. § 186 (emphasis supplied). Pursuant to this

authority, the DOC adopted 37 Pa. Code 93.10(b). *See Spencer v. Fies*, 2007 WL 2852458, at

*4–5 (W.D. Pa. Sept. 27, 2007) ("the section merely directs the DOC to maintain and

disseminate written procedures regarding inmate discipline."). However, the text of neither the

enabling statute nor the regulation expressly authorizes a private cause of action based on a

prison official's failure to abide by the procedural dictates of § 93.10 or DOC policy DC-ADM

801.

Likewise, neither Section 506 of the Pennsylvania Administrative Code, § 93.10, nor

DOC policy DC-ADM 801 can be construed as creating an implied cause of action for money

damages. Pennsylvania adheres to the "three-part test for determining whether an implied

private right of action exists . . . derived from the United States Supreme Court's decision in

*Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975)." *Palmiter v. Commonwealth*

*Health Sys., Inc.*, 2021 Pa. Super. Ct. 159, 260 A.3d 967, 971 (2021) (citing *Witthoeft*, 557 Pa.

at 733). In *Palmiter*, the Superior Court explained:

> Implied authority for a private cause of action exists when (1) the
> plaintiff is part of a class for whose 'especial' benefit the statute
> was enacted; (2) there is an indication of legislative intent to

> create or deny a remedy; and (3) an implied cause of action is
> consistent with the underlying purpose of the legislative scheme.

*Id.* (citing *MERSCORP, Inc. v. Del. Cty.*, 652 Pa. 173 (2019) (citing *Witthoeft*, 557 Pa. at 626)).

At the outset, the Court notes that *Cort* and the cases interpreting it discuss when a *statute* may create an implied right of action. Here, we are dealing with a regulation. Federal statutes are passed by Congress and state statutes by state legislatures. In contrast, regulations are adopted by governmental agencies pursuant to the authority the legislative body conferred upon them in their enabling statutes. The Court has identified no authority for the proposition that a state agency has the regulatory authority to create an express or implied right of action absent the grant of such authority in its enabling statute. In other words, a cause of action, express or implied, for money damages arises only where the applicable legislative body authorize it or authorizes a regulatory body to create it. Thus, if an implied cause of action based on § 93.10 exists, it must arise from Section 506 of the Pennsylvania Administrative Code.

Nothing in the language of the Administrative Code (or even § 93.10 itself) suggests that an inmate or other private party may bring an action for damages against a prison official for violating § 93.10. Section 506 of the Administrative Code does grant broad authority for agencies to "prescribe rules and regulations, not inconsistent with law, for the government of their respective departments, boards, or commissions . . ." Although this language gives agencies the authority to adopt rules, regulations, and procedures to govern themselves, it is too broad and vague to be construed as benefiting a "class for whose 'especial' benefit the statute was enacted" or indicating "legislative intent to create … a remedy." *See Palmiter*, 2021 Pa. Super. Ct. at 260 A.3d at 971. To construe Section 506 otherwise would mean that any agency operating under the purview of Section 506 of the Administrative Code would have the power

18

to create new causes of action. The statute does not support a legislative grant of such profound

reach. Regarding its specific application to the DOC, Section 506 simply authorizes the DOC

to create and issue inmate disciplinary policies that conform to specified procedural protections.

*See Burns*, 642 F.3d at 168 (citing 37 Pa. Code § 93.10) ("The Pennsylvania Administrative

Code establishes a baseline policy for prisons to manage disciplinary infractions.").

Furthermore, the Commonwealth Court of Pennsylvania has repeatedly held that

"administrative rules and regulations do not create rights in prison inmates." *Tindell v. Dep't of*

*Corr.*, 87 A.3d 1029, 1035 (Pa. Commw. Ct. 2014) (citing *Commonwealth ex rel. Buehl v.*

*Price*, 705 A.2d 933, 936 (Pa. Cmmw. Ct. 1997); *Lawson v. Department of Corrections*, 114 Pa.

Cmmw. Ct. 573, 539 A.2d 69, 71–72 (1988). *See also Kalick*, 372 Fed. Appx. at 320 (citing

*Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) (regulation on its own cannot create a private

right of action)). Accordingly, the Court finds no implied cause of action in the Administrative

Code of 1929 or the DOC's regulations adopted pursuant thereto.

    In his opposition brief, Deans cites to several Pennsylvania Commonwealth Court

decisions that allowed an inmate to seek mandamus or similar relief where prison officials

failed to abide by the procedural safeguards of 37 Pa. Code § 93.10 and DC-ADM 801. *See*

*e.g.*, *Banks v. PA DOC*, 759 A.2d 432 (Pa. Commw. Ct. 2000). In *Banks*, the Commonwealth

Court granted the inmate's petition for writ of mandamus, which it "treated as a petition for

review, requesting [the court] to compel the Chief Hearing Examiner to provide him with a

copy of its decision concerning the final appeal review," in accordance with DOC policy. 759

A.2d at 433. Objecting to the petition, the DOC argued that "Banks ha[d] failed to establish that

he ha[d] a clear legal right to relief as he ha[d] no protected due process right in receiving a

decision from the Department on his internal appeal of his misconduct charges." *Id.* In

granting Banks' petition, the court explained that "[w]hile we may not be able to review the Department's decision once it is issued, it is still required to provide Banks with a decision pursuant to its own regulations." *Id.* at 434. Thus, the court in Banks did not address whether § 93.10 created an implied cause of action for damages.

Deans also relies on *Bush v. Veach*, 1 A.3d 981, 985 (Pa. Commw. Ct. 2010) as support for his claim against Floyd. In that case, the Commonwealth Court addressed a petition alleging that a prison Unit Manager permanently removed the inmate-plaintiff from his prison job without following the requirements of the Inmate Handbook, including the requirement that he be afforded a formal hearing process on the underlying misconduct charge against him. Based on these alleged facts, the court held that the plaintiff "ha[d] stated a cause of action for a violation of the process set forth in 37 Pa. Code § 93.10." *Id.* In *Bush*, however, the court did not hold that the plaintiff had an implied cause of action for damages under § 93.10. Although the Petitioner included a claim for such damages, the court never discussed the relief available for the cause of action it apparently recognized; nor did it undertake the analysis specified by the Supreme Court in *Cort* and adopted by the Pennsylvania Superior Court in *Palmiter* for determining whether a statute or regulation implies a cause of action for damages. Accordingly, *Bush* should not be read to stand for the proposition that § 93.10 creates an implied cause of action for damages based on a prison official's failure to adhere to its requirements.

Deans also cites to *Williams v. Wetzel*, 178 A.3d 920 (Pa. Commw. Ct. 2018), which relied upon the *Bush* holding to overrule the DOC's preliminary objections to Williams' petition for review because prison officials removed Williams from his job without first "follow[ing] the procedure set forth in [37 Pa. Code § 93.10(b) ]." 178 A.3d at 932 (quoting *Bush*, 1 A.3d at 984). Again, however, the court did not hold that § 93.10 created an implied right of action for

money damages or undertake the *Cort/Palmiter*'s multi-prong analysis for determining whether a statute created one.

Thus, none of the cases relied upon by Deans analyzed whether § 93.10 implied a cause of action for money damages. The only relief Pennsylvania courts have authorized based on a violation of § 93.10 is relief in the form of mandamus, declaratory, or injunctive relief to compel the DOC to follow its own regulations. This is a far cry from finding that § 93.10 implies a private right of action for money damages. As such, these cases provide no support for the claim Deans asserts against Floyd in this case.[7]

Deans' purported claim against Floyd is further negated by the Pennsylvania Supreme Court's decision in *Williams v. Wetzel*, 659 Pa. 500, 232 A.3d 652 (2020). In that case, the Court held that "the Commonwealth Court lacks original jurisdiction to entertain a prisoner's due process challenge to the actions of prison officials" based on an alleged violation of § 93.10, "where the inmate fails to assert a constitutionally-protected liberty or property interest." *Id.* at 502, 232 A.3d at 654 (citing *Bronson v. Central Office Review Committee*, 554 Pa. 317, 721 A.2d 357 (1998)). The *Williams* Court explained:

> We observe that the majority decision in the present case followed the lead of the Bush decision in recognizing a right to the process set forth in prison regulations. *See Williams*, 222 A.3d at 54 (citing *Bush*, 1 A.3d at 984). The *Bush* court, however, also failed to

---

[7] "[W]here the applicable rule of decision is the state law, it is the duty of the federal court to ascertain and apply that law, even though it has not been expounded by the highest court of the state." *Commonwealth of Pennsylvania v. Brown*, 373 F.2d 771, 777 (3d Cir.1967). "In developing this forecast, '[a]lthough not dispositive, decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise.'" *Jewelcor Inc. v. Karfunkel*, 517 F.3d 672, 676 n.4 (3d Cir. 2008) (quoting *City of Philadelphia v. Lead Industries Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir.1993)). In this case, however, the Court finds that the Commonwealth cases cited by Deans are distinguishable from the present case and do not support his claim against Floyd. Moreover, as discussed below, were the Court to read these cases as Deans suggests, they would still fail to support his claim because, so interpreted, their holdings would be inconsistent with the Pennsylvania Supreme Court's decision in *Williams v. Wetzel*, 659 Pa. 500, 502, 232 A.3d 652, 654 (2020).

> consider the lack of jurisdiction, in the Commonwealth Court, over due-process claims grounded upon prisoner grievances that are not predicated on a constitutionally-protected liberty or property interest.

*Id.*, at 503, 232 A.3d at 654.

The *Williams* Court also relied on its decision in *Bronson*, wherein it explained:

> [I]nternal prison operations are more properly left to the legislative and executive branches, and that prison officials must be allowed to exercise their judgment in the execution of policies necessary to preserve order and maintain security free from judicial interference. *See Robson [v. Biester*, 53 Pa. Cmwlth. 587, 420 A.2d 9, 12 (1980)] (citing *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). ... Unlike the criminal trial and appeals process where a defendant is accorded the full spectrum of rights and protections guaranteed by the state and federal constitutions, and which is necessarily within the ambit of the judiciary, the procedures for pursuing inmate grievances and misconduct appeals are a matter of internal prison administration and the "full panoply of rights due a defendant in a criminal prosecution is not necessary in a prison disciplinary proceeding...." *Robson, supra* at 12 (citing *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)).

*Bronson*, 554 Pa. at 321, 721 A.2d at 358–59. The Supreme Court's reasoning in both *Williams* and *Bronson* is fundamentally inconsistent with the existence of an implied cause of action for damages based on § 93.10 or any other of its regulations or policies. For the foregoing reasons, the Court is compelled to reject the viability of such a cause of action in this case.

This holding, however, may not end the analysis regarding § 93.10. In his brief in opposition to the Defendants' motion, Deans states that, at minimum, he wants the Court to order a new hearing on Misconduct 0432747. But Deans did not request this relief in his Amended Complaint. And "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (internal quotation and citation omitted); *see Carpenters Health 86 Welfare Fund of*

*Phila. & Vicinity v. Mgmt. Res. Sys.*, 837 F.3d 378, 383 (3d Cir. 2016) (party may not amend complaint in brief opposing a motion to dismiss).

Deans' invitation to treat his Amended Complaint as requesting a new misconduct hearing is also untenable because he has asserted Count IV only against Floyd, a corrections lieutenant at SCI-Albion. The Amended Complaint alleges no facts to indicate that Floyd holds a position in the prison that makes him responsible for the scheduling or conducting of misconduct hearings or that would allow him to schedule a new misconduct hearing. Indeed, Deans' allegations reveal that Floyd had no responsibility for scheduling or conducting the misconduct hearing at issue. Instead, Floyd is alleged to have improperly encouraged the hearing examiner to find Deans guilty of the misconduct and to place him in the RHU. Thus, the claim against Floyd is that he improperly influenced the hearing examiner, not that he had any role in or responsibility for the conduct of the hearing. In fact, the allegations of the Amended Complaint do not support that any of the five defendants in this action had any role in conducting the misconduct hearing or occupy a position that would allow him to schedule a new misconduct hearing for Deans. Given this, the Court cannot reasonably construe the Amended Complaint as requesting mandamus, equitable, or declaratory relief in the form of an order for a new misconduct hearing.

D. Deans also has no viable procedural due process claim under federal or state law.

Deans has expressly disclaimed Defendants' characterization of his claim against Floyd in Count IV as a procedural due process claim. Nevertheless, given his *pro se* status and the Court's dismissal of his claim based on an implied cause of action under § 93.10, the Court will assess whether the facts alleged in his Amended Complaint support a procedural due process

claim under the Fourteenth Amendment or Pennsylvania state law. As explained below, the Court finds that they do not.

The Fourteenth Amendment of the United States Constitution provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law." The United States Supreme Court has mandated a two-part analysis of Fourteenth Amendment procedural due process claims. *See Ingraham v. Wright*, 430 U.S. 651, 672 (1977). First, the reviewing court must determine "whether the asserted individual interests are encompassed within the . . . protection of 'life, liberty or property.'" *Id.* If a protected interest is implicated, the court must "decide what procedures constitute 'due process of law.'" *Id.* If no protected interest is implicated, however, then "it is unnecessary to analyze what procedures were followed when an alleged deprivation of an interest occurred." *Harris v. Hines*, 2017 WL 4119743, at *5 (M.D. Pa. Sept. 18, 2017).

"To state a claim under § 1983 for deprivation of procedural due process rights, a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir.2000)). In this case, Deans alleges that he was wrongly placed in the RHU because of the hearing examiner's lack of impartiality following Floyd's improper attempt to influence him and the hearing examiner's reliance upon "the unverified and uncorroborated account of an unknown (or non-existent) confidential informant" in violation of the DC-ADM § 801. The Court need not determine whether the hearing examiner deviated from procedure, however, because Deans was not placed in the RHU for a duration long enough to implicate a liberty interest under the

Fourteenth Amendment and, therefore, did not trigger due process protections. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995).

In *Sandin*, the Supreme Court explained "that States may under certain circumstances create liberty interests which are protected by the Due Process Clause," "[b]ut these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 484. Thus, disciplinary segregation in a prison restrictive housing unit or other confinement will trigger due process protection only if it imposes atypical and significant hardship on the inmate. *See id.* at 486.

In determining whether disciplinary segregation imposes such a hardship, the court must consider: (1) the duration of the disciplinary confinement; and (2) whether the conditions of confinement were significantly more restrictive than those imposed upon other inmates in solitary confinement. *See id.* at 486. For example, our Court of Appeals has held that eight years in administrative custody where the inmate was confined to his cell for 23 hours each day, ate meals by himself, and was prohibited from participating in organizational activities, was atypical and implicated a protected liberty interest. *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir.2000). In this case, Deans' placement in the RHU for 75 days falls far short of the threshold necessary to implicate a liberty interest. *See Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir.2002) (seven months in disciplinary confinement did not implicate a liberty interest); *Torres v. Fauver*, 292 F.3d 141, 151–52 (3d Cir. 2002) (disciplinary detention for fifteen days and administrative segregation for 120 days did not implicate a protected liberty interest); *Nifas v. Beard*, 374 Fed. Appx. 241, 244 (3d Cir. 2010) ("confinement in AC for 178 days and a 90-day

placement on the RRL does not amount to an 'atypical and significant hardship' when

compared to the ordinary incidents of prison life"); *Sanchez v. Walton*, 2019 WL 249537, at

*2-3 (E.D. Pa. Jan. 16, 2019) ("ninety (90) day confinement in segregation is insufficient to

establish that [inmate] was deprived of a liberty interest").

Deans' inability to demonstrate a protected liberty interest ends the inquiry.  As the

Court of Appeals has explained, prison regulations regarding disciplinary hearings do not alone

create a liberty interest:

> The fact that Pennsylvania regulations provide for hearings after
> transfer to administrative custody is not relevant to a
> determination of whether federal procedural due process is
> required. *See Hewitt v. Helms*, 459 U.S. 460, 470, 103 S.Ct. 864,
> 74 L.Ed.2d 675 (1983) (The mere fact that Pennsylvania has
> created a careful procedural structure to regulate the use of
> administrative segregation does not indicate the existence of a
> protected liberty interest.). The process afforded by state law is
> not relevant in determining whether there is a state created right
> that triggers due process protection.

*Griffin v. Vaughn*, 112 F.3d 703, 709 n. 3 (3d Cir.1997).  Therefore, an inmate such as Deans

"has no constitutional liberty interest in the Defendants following the procedures allegedly

mandated by state law." *Dantzler v. Beard*, 2007 WL 5018184, at *5 n.7 (W.D. Pa. Dec. 6,

2007), *report and recommendation adopted*, 2008 WL 744740 (W.D. Pa. Mar. 18, 2008)

(citations omitted).  Because Deans was not deprived of a protected liberty or property interest,

he has no grounds upon which to base a Fourteenth Amendment procedural due process claim.

The absence of a protected liberty or property interest also precludes a due process claim

under Pennsylvania state law.  As previously discussed, the Pennsylvania Supreme Court does

not recognize alleged violations of the procedures set forth in 37 Pa. Code § 93.10(b) or DC-

ADM 801 as a basis for a due process claim unless the plaintiff independently demonstrates the

loss or impairment of a protected liberty or property interest.  *Williams*, 659 Pa. at 502, 232

A.3d at 654; *Bronson*, 554 Pa. at 321, 721 A.2d at 358–59.  Because Deans' placement in the

RHU does not implicate such an interest, he has no basis for claim under Pennsylvania law.

Accordingly, Deans' due process claims asserted under the Fourteenth Amendment and 37 Pa.

Code § 93.10 will be dismissed.

    V.      Leave to Amend

       The Third Circuit has instructed that if a complaint is vulnerable to dismissal for failure

to state a claim, the Court should permit a curative amendment unless an amendment would be

inequitable or futile.  *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).  The

Court may deny leave to amend where there is "undue delay, bad faith[,] or dilatory motive on

the part of the movant, repeated failure to cure deficiencies by amendments previously allowed,

undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of

the amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  And though "the grant or denial

of an opportunity to amend is within the discretion of the District Court," it may not "outright

refus[e] to grant the leave without any justifying reason appearing for the denial."  *Id.*  These

instructions are equally applicable to *pro se* litigants and those represented by counsel.  *Alston

v. Parker*, 363 F.3d 229, 235 (3d Cir. 2004).

       In this case, Deans may be able to allege additional facts to state an equal protection

claim.  Accordingly, the Court will dismiss this claim without prejudice and with leave to file a

second amended complaint within **twenty days**.[8]  If Deans fails to file a second amended

complaint within this time, the Court will enter an order dismissing this claim with prejudice.

---

[8] Deans is advised that a second amended complaint must be complete in all respects and takes the place of the
original complaint.  As such, the second amended complaint must identify each party and allege the "claims in
short, concise, and plain statements."  Fed R. Civ. P. 8.  Further, Deans must re-assert in the second amended
complaint every cause of action from the amended complaint or claim that the Court did not dismiss with prejudice
and that Deans intends to continue to prosecute.  *Palakovic v. Wetzel*, 854 F.3d 209, 220 (3d Cir. 2017) ("an
amended pleading . . . supersedes the earlier pleading and renders the original pleading a nullity").

Deans' due process claims and his claims based on violation of 37 Pa. Code § 93.10 and DC-ADM 801 suffer from legal deficiencies that make any attempt to cure by amendment futile. No express or implied right of action for damages exists under 37 Pa. Code § 93.10 or DC-ADM 801. Even if mandamus relief was potentially authorized based on alleged violations of 37 Pa. Code § 93.10 or DC-ADM 801, none of the Defendants named in this action holds a position that would allow him to effectuate such relief. Accordingly, the Court will dismiss Deans' procedural due process claims under federal and state law and his claims based on violation of 37 Pa. Code § 93.10 and DC-ADM 801 with prejudice.[9]

VI.    Conclusion

For the foregoing reasons, Defendants' partial motion to dismiss Deans' Amended complaint is GRANTED in part and DENIED in part. Defendants' motion is DENIED as to Deans' § 1983 claim based on his separation from his brother is DENIED, without prejudice, because Defendants have failed to produce a record sufficient to support their statute of limitations defense. Defendants' motion is GRANTED as to Deans' Fourteenth Amendment equal protection claim, his procedural due process claims under federal and state law, and his claims based on violation of 37 Pa. Code § 93.10 and DC-ADM 801. Deans' equal protection claim (Count II) is dismissed without prejudice and with leave to file a second amended complaint as to this claim within twenty (20) day. Deans' procedural due process claims under federal and state law and his claim against Defendant Floyd based on violation of 37 Pa. Code § 93.10 and DC-ADM 801 (Count IV) are dismissed with prejudice.

_____

[9] The Court expresses no position regarding whether Deans may assert a claim in state court for a violation of 37 Pa. Code § 93.10 or DC-ADM 801 against persons other than Floyd. As Floyd is the only Defendant named in Count IV, the viability of such a claim against any other person is not before the Court.

DATED this 30th day of May, 2023.

BY THE COURT:

RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE
JUDGE